APPEAL OF GENERAL EQUIPMENT CO.

Docket No. 2205.   Submitted May 29, 1925.   Decided October 6, 1925.

Upon organization in 1917 the taxpayer acquired by assignment certain contracts and agreements upon which it claimed a deduction for exhaustion in its income-tax return for 1918. Held, upon the evidence, that the taxpayer is not entitled to the deduction claimed.

Frank R. Serles, Esq., for the taxpayer.
Willis D. Nance, Esq., for the Commissioner.

Before JAMES, LITTLETON, and SMITH.

This appeal is from the determination of a deficiency in income tax for the year 1919 in the amount of $1,277.54. The deficiency arises through the disallowance by the Commissioner of a deduction from gross income claimed by the taxpayer in the amount of $93,974.33, on account of exhaustion of certain contracts used in the business.

## FINDINGS OF FACT.

The taxpayer was incorporated January 29, 1917, under the laws of the State of Delaware, and has its principal office at Wilmington. It is the successor to the business formerly carried on by a Delaware corporation of the same name which was dissolved. The latter corporation had, on July 6, 1911, succeeded to the business theretofore carried on by the Atlantic Equipment Co., a subsidiary of the American Locomotive Works.

In order to make the facts entirely clear, it is necessary to go back to the date of the organization of taxpayer's immediate predecessor and consider the events which took place then, as well as such later events in the history of that organization as are material in throwing light upon the matter we have under consideration.

For several years prior to July 6, 1911, the Atlantic Equipment Co. had been engaged in buying and selling second-hand railroad and contractors' equipment. All of its capital stock was owned by the American Locomotive Works, and for all practical purposes it was conducted as a department of the parent organization.

On July 6, 1911, the first General Equipment Co. was organized under the laws of Delaware, with a total authorized capital stock of $325,000, divided into 3,250 shares of the par value of $100 each, for the purpose of taking over the assets and the business theretofore owned and conducted by the Atlantic Equipment Co.

On August 23, 1911, the Atlantic Equipment Co. entered into an agreement with Samuel G. Allen, H. J. Davis, and Joel S. Coffin, whereby it agreed to sell and convey to the individuals named its entire business and good will, including all contracts relating thereto. The agreement, wherein the company is referred to as the " vendor " and the individuals named as the " vendees," contains, among other things, the following provisions:

That the parties hereto, in consideration of the mutual covenants herein contained, hereby agree as follows:

First. Vendor agrees:

(a) To transfer and deliver unto Vendees, or their assigns, under the conditions hereinafter stated:

1. Its entire second-hand railroad and contractors' equipment business and good will, including all contracts relating thereto, as set out in Schedule A hereto annexed.

2. Its equipment on hand as set forth in Schedule B hereto annexed.

(b) To refrain from entering, directly or indirectly, into the purchase or sale of, or other dealing in, second-hand railroad or contractors' equipment for a period of ten (10) years from the date of this agreement, and within a radius of two thousand miles from the City of New York; provided, however, that nothing herein contained shall affect or in any way limit the right of Vendor to purchase any railroad or contractors' equipment which may be sold at public

or private sale to satisfy any lien thereon which Vendor may have by virtue of any chattel mortgage, equipment trust, or contract of sale heretofore made and executed, and to re-sell any equipment so purchased at public or private sale, either with or without repairing or rebuilding the same.

Second. Vendees agree in payment for the said business and good will, to deliver or cause to be delivered to Vendor, eight hundred (800) shares of the full-paid and non-assessable capital stock of the par value of one hundred dollars ($100.) each of General Equipment Company, a corporation of the State of Delaware.

On September 29, 1911, the agreement referred to and quoted in part above was assigned by the vendees, with the consent of the vendor, to the newly created corporation, the first General Equipment Co., in consideration of the issuance by the latter to the vendees of its capital stock of a par value of $277,250. This agreement was thereupon entered in the books of account of the new company as "Contracts and good will" at a value of $277,500, and was so stated thereon until the company was dissolved under circumstances which will hereinafter appear.

After coming into existence the General Equipment Co. entered into some 29 contracts and agreements, which in 1916 were entered in its books of account, in the account "Contracts and good will," at a value of $40,000. These agreements and contracts are as follows:

(1) Agreement dated June 5, 1912, with the Pennsylvania Railroad Co., under which the General Equipment Co. is given the exclusive right for an unstated period, but subject to cancellation on 90 days' notice from either party, to sell locomotives retired from the service of the Railroad Company at certain minimum prices on a commission basis of 17½ per cent of the selling prices.

(2) Agreement dated September 12, 1912, with the Newell & Snowling Construction Co., under which the General Equipment Co. is given the exclusive right to sell such equipment and plant as the Construction Company " may decide to dispose of from time to time." Agreement subject to cancellation upon 90 days' notice from either party.

(3) Agreement dated January 16, 1913, with the O'Brien Construction Co., under which the General Equipment Co. is given the exclusive right to sell retired steam shovels, locomotive cranes, etc., for an unstated period but subject to cancellation upon 90 days' notice from either party, profit or commission not to exceed 17½ per cent of the selling prices.

(4) Agreement dated May 15, 1913, with the Central Locomotive & Car Works, under which the parties are to have a one-half interest in any contract that the New York Central Lines, or any of the railroads composing said lines, shall make with either party for the sale of retired locomotives. Said agreement defines the boundaries of the sales territory to be controlled by each; designates each as the

agent of the other within their own territory; provides that the compensation to each when acting as agent for the other shall be a commission of 5 per cent on gross sales; and provides further that the General Equipment Co. will endeavor to secure car repair contracts from the New York Central Lines for said Central Locomotive & Car Works, the Equipment Company to receive as compensation 25 per cent of the first 10 per cent net profit, and 50 per cent of any additional profit. Agreement to run five years, subject to termination by either party upon six months' notice in writing.

(5) Agreement dated July 3, 1913, with the Western Wheeled Scraper Co., under which the General Equipment Co. is designated as sales agent within a definite territory, for a period of five years, subject to termination by either party upon three months' notice in writing, commissions to be paid in accordance with the rates stipulated in the agreement.

(6) Agreement dated October 27, 1913, with the Richmond, Fredericksburg & Potomac Railroad Co., under which the General Equipment Co. is given the exclusive right, for an unstated period, but subject to termination on 90 days' notice by either party, to sell equipment retired from the service of the Railroad Company, on a commission basis of 17½ per cent of the selling prices.

(7) Agreement dated April 6, 1914, with the Pittsburgh & Lake Erie Railroad Co., for the purchase by the General Equipment Co. of 20 by 26 inch cylinder consolidation locomotives for $5,000 each.

(8) Agreement dated June 24, 1914, with the Pittsburgh & Lake Erie Railroad Co., for the purchase by the General Equipment Co. of box cars bearing serial numbers 700 to 999, inclusive, and 1,695 to 1,794, inclusive.

(9) Agreement dated February 2, 1915, with the Lehigh & New England Railroad Co., under which the General Equipment Co. is given the exclusive right, for an unstated period, but subject to termination on 90 days' written notice by either party, to sell equipment retired from the service of the Railroad Company, on a commission basis of 17½ per cent of the selling prices.

(10) Agreement dated April 8, 1915, with the Commercial Coal Mining Co., under which the General Equipment Co. is given the exclusive right to sell 50 steel gondola cars (except such as may be sold by the owner).

(11) Agreement dated June 15, 1915, with the Delaware, Lackawanna & Western Railroad Co., under which the General Equipment Co. is given the exclusive right, for an unstated period, but subject to termination on 90 days' notice by either party, to sell equipment retired from the service of the Railroad Company, on a commission basis of 17½ per cent of the selling prices.

(12) Agreement dated August 2, 1915, with the Buckeye Traction Ditcher Co., under which the General Equipment Co. is designated as sales agent within a definite territory, for a period of one year, with provision for renewal by mutual agreement and subject to termination by either party upon 60 days' written notice. Commissions to be based on 7½ per cent of the selling prices.

(13) Agreement dated December 7, 1915, with the New York Central Railroad Co., under which the General Equipment Co. is given the exclusive right, for an unstated period, but subject to termination on 90 days' written notice by either party, to sell locomotives retired from the service of the Railroad Company, on a commission basis of 17½ per cent of the selling prices.

(14) Bill of sale dated December 15, 1915, under which Charles R. Powell conveyed to the General Equipment Co. all freight cars sold and transferred to said Powell by the receivers of the Pittsburgh-Buffalo Co., as evidenced by receivers' bill of sale to Powell dated December 14, 1915.

(15) Agreement dated January 8, 1916, with the Susquehanna Finance Corporation for the purchase by the General Equipment Co., of 400 steel gondola cars. Also agreement dated January 10, 1916, with the Norfolk & Western Railway, under which the General Equipment Co. sold to the Railway Company 300 of these same cars.

(16) Agreement dated March 28, 1916, with the Susquehanna Finance Corporation for the purchase by the General Equipment Co. of 98 steel gondola cars.

(17) Agreement dated April 6, 1916, with the Susquehanna Finance Corporation, under which the General Equipment Co. sold to the Finance Corporation 500 wooden gondola cars.

(18) Bill of sale dated April 24, 1916, under which Cambria & Indiana Railroad Co. conveyed to the General Equipment Co. one locomotive.

(19) Bill of sale dated May 8, 1916, under which Patterson Moran Co., Inc., conveyed to the General Equipment Co. three locomotives.

(20) Bill of sale dated June 15, 1916, under which North Shore Gravel Co., Inc., conveyed to the General Equipment Co. certain equipment.

(21) Bill of sale dated July 11, 1916, under which Lake Champlain & Moriah Railroad Co. conveyed to the General Equipment Co. one locomotive.

(22) Bill of sale dated July 24, 1916, under which Hoisting Machinery Co. conveyed to the General Equipment Co. certain equipment.

(23) Agreement dated August 28, 1916, with the Atlanta, Birmingham & Atlantic Railway, under which the General Equipment

Co. is given the exclusive right, for an unstated period, but subject to termination on 90 days' written notice by either party, to sell locomotives retired from the service of the Railway Company, on a commission basis of 17½ per cent of the selling prices.

(24) Bill of sale dated August 26, 1916, under which Somerset Contracting Co., Inc., conveyed to the General Equipment Co. one Bucyrus shovel.

(25) Bill of sale dated October 17, 1916, under which M. T. Corkhill conveyed to the General Equipment Co. six standard-gauge dump cars.

(26) Bill of sale dated November 2, 1916, under which Cotton States Seed & Fertilizer Co., Inc., conveyed to the General Equipment Co. 12 all-steel tank cars.

(27) Agreement dated November 14, 1916, with the Consolidated Rolling Mills & Foundries Co., Inc., under which the General Equipment Co. sold to that company 20 cartridge-making machines.

(28) Bill of sale dated November 6, 1916, under which the F. H. Chapman Contracting Co. conveyed one Bucyrus steam shovel to the General Equipment Co.

(29) Bill of sale dated November 11, 1916, under which the Susquehanna Finance Corporation conveyed certain railway rolling equipment to the General Equipment Co.

Before the dissolution of the first General Equipment Co., one other agreement was made under date of January 22, 1917, with the Wheeling & Lake Erie Railroad for the purchase by the General Equipment Co. of 84 gondolas.

On January 18, 1917, the first General Equipment Co. was dissolved by proper action on the part of its board of directors and its stockholders. Certificate of dissolution was filed in the office of the Secretary of State on January 29, 1917.

On January 26, 1917, the second General Equipment Co., the taxpayer in this case, was organized under the laws of the State of Delaware with a total authorized capital stock of $1,125,000, divided into 11,250 shares of the par value of $100 each, for the purpose of taking over the assets and business theretofore owned and conducted by the first General Equipment Co.

On January 30, 1917, the dissolved corporation sold, transferred, and conveyed to the newly created General Equipment Co. all its assets of whatsoever nature and description, including all good will attaching to the business, in consideration of the covenant of the vendee " to assume and pay all provable debts and obligations outstanding against the vendor and to issue to the vendor, or its nominees, capital stock of the vendee to the amount of 11,250 shares."

92208—26———52

Upon opening its books of account the taxpayer entered therein as a debit to the account "Good will and contracts" the sum of $317,250, being the par value of the capital stock alleged to have been issued for the contracts acquired from its predecessor. The contracts are the 30 contracts hereinbefore enumerated and described, and the agreement dated August 23, 1911, under which the Atlantic Equipment Co. conveyed its business and good will to Samuel G. Allen, H. J. Davis, and Joel S. Coffin, more particularly with reference to the covenant therein contained that the Atlantic Equipment Co. agrees "To refrain from entering, directly or indirectly, into the purchase or sale of, or other dealing in, second-hand railroad or contractors' equipment for a period of ten (10) years from the date of this agreement, and within a radius of two thousand miles from the City of New York."

On its return for the year 1919 the taxpayer reported a net loss of $57,087.56 as the result of the year's operations. Included in the deductions from gross income, as stated in the return, is the sum of $95,030.63, as exhaustion, wear and tear. The supporting schedules attached to the return show that of the total deduction claimed for exhaustion, wear and tear, $94,000 was claimed as an allowance for exhaustion of the contracts under consideration and the balance, $1,030.63, as an allowance for wear and tear on furniture and fixtures. The Commissioner has determined that the taxpayer actually realized a taxable net income for the year 1919 of $18,751.86, such determination being predicated in part upon his disallowance of the deduction claimed in the return for exhaustion, wear and tear in the sum of $95,030.63, and his substitution therefor of an allowance for exhaustion, wear and tear of furniture and fixtures only in the sum of $1,056.30. This adjustment by the Commissioner is responsible in part for the deficiency now before us on appeal.

#### DECISION.

The determination of the Commissioner is approved.

#### OPINION.

SMITH: In its petition the taxpayer alleges that the deficiency determined by the Commissioner is predicated upon the following errors:

(a) That the Commissioner erred in entirely eliminating the account "Good will and contracts" in computing the invested capital for profits-tax purposes.

(b) That the Commissioner erred in refusing to permit the taxpayer to take a deduction on account of the exhaustion of certain valuable contracts, constituting the asset referred to in (a) above, in computing the net income for 1919.

With respect to the first allegation of error, we find that while the Commissioner has refused to allow, for invested capital purposes, any value for good will and contracts, such action is in no wise responsible for any part of the deficiency on appeal. The invested capital as finally determined by the Commissioner is in such an amount that the credits provided for under sections 311 and 312 of the Revenue Act of 1918 are greater than the taxable net income determined by the Commissioner, so that no profits taxes result nor does the Commissioner propose to assert any. The deficiency which the Commissioner has found is a deficiency in income tax only, in the computation of which invested capital is not a factor. The first allegation of error, therefore, raises an academic question which we do not deem it necessary to pass upon at this time.

Coming now to the second allegation of error, we are confronted with the question whether the taxpayer is entitled, in the computation of its taxable net income, to a deduction representing a reasonable allowance for exhaustion of the contracts, hereinbefore enumerated and described, under the provisions of section 234 (a) (7) of the Revenue Act of 1918. That section provides as follows:

SEC. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

The theory underlying this provision of the statute is the allowance of a return to the taxpayer of his capital investment before taxing a profit derived in part from the exhaustion or using up of capital. *Appeal of William J. Ostheimer*, 1 B. T. A. 18; *Appeal of The Brevoort Hotel Co.*, 1 B. T. A. 132; *Appeal of Union Metal Manufacturing Co.*, 1 B. T. A. 395; *Appeal of William Harris, Jr.*, 2 B. T. A. 156. It is grounded on the fact that most kinds of property approach a point where their usefulness is exhausted either through actual wear and tear, the normal progress of the art, or the effluxion of time. Such an allowance may be made with respect to assets employed in the business, where the lessening in value or their exhaustion is attributable entirely to their gradual diminishing life measured in periods of time, such as copyrights, leaseholds, and patents. And this principle may be extended to contracts and other intangible property where their life is definitely limited.

The contracts and agreements with respect to which this taxpayer claims an allowance for exhaustion are 31 in number, and they have all been briefly described in our findings of fact, but for the purpose of applying the principle of law involved we will have occasion to summarize them briefly below.

The most important contract, and the one to which the taxpayer attributes the greatest value, is the agreement dated August 23, 1911,

by and between the Atlantic Equipment Co. and Samuel G. Allen, H. J. Davis, and Joel S. Coffin, under which the Equipment Company conveyed to those individuals all its business and good will and agreed to refrain from carrying on any similar business for a period of 10 years within a radius of 2,000 miles from the City of New York. This agreement passed by assignments to the first General Equipment Co. and later to this taxpayer. The value of this contract arises, as the taxpayer contends, from the covenant contained therein that the Atlantic Equipment Co. would refrain from doing business for a definite period within a definite territory.

The remaining contracts may be summarized as follows:

| | |
|---|---|
| (a) Agency contracts for indefinite periods | 10 |
| (b) Agency contracts for five years | 2 |
| (c) Purchase agreements | 5 |
| (d) Sales agreements | 2 |
| (e) Bills of sale | 11 |
| Total | 30 |

With respect to item (a), agency contracts for indefinite periods, it is obvious that no allowance may be made for exhaustion with respect thereto, since no exhaustion is actually taking place, within the purview of the statute, which is susceptible of measurement.

With respect to items (c) and (d), these are mere purchase and sale agreements and apparently were executed and not executory contracts of value in the hands of this taxpayer. All of them are dated from one to four years prior to the date the taxpayer was organized as a corporation, and if they were in existence as executory contracts at the date of organization, and acquired by the taxpayer as such, taxpayer has failed to show by any evidence whatever that such was the case.

Item (e), bills of sale or conveyances of personal property, certainly may not be made the subject of an allowance for exhaustion.

This disposes of all except the Atlantic Equipment Co. agreement dated August 23, 1911, and item (b), agency contracts for five years. At the date these three contracts were acquired by this taxpayer the Atlantic Equipment Co. agreement had a remaining life of but four and one-half years; one of the agency contracts, that of the Western Wheeled Scraper Co., had a remaining life of one and one-third years, and the other agency contract, that of the Central Locomotive & Car Works, had a remaining life of one year and two and one-half months.

What part of the total consideration paid to its predecessor for the total assets and business may be allocated to these three contracts, we do no know. Even if that could be determined it would avail us nothing, since we have no evidence before us upon which we

could make a finding as to the value of the capital stock which formed a part of that consideration. Nor has the taxpayer by any competent evidence proven that these particular contracts had a market value at the date acquired by it. How, then, under such circumstances, can we find that it is entitled, in computing its taxable net income, to a deduction for exhaustion of these contracts?

Taxpayer submits a statement showing the average earnings and the average tangible assets employed in the business of its predecessor for the five-year period ending June 30, 1916, and asks us, by providing a fair return on the average tangibles and capitalizing the remaining earnings at a fair rate, to find that the contracts which it acquired from its predecessor had a value of at least $317,250, which was the par value of the capital stock issued for the entire business and assets. But such a method of valuation is clearly fallacious when applied in the valuation of assets of the character of these contracts where time is of the essence. It fails entirely to take into account one of the most important factors, the length of time the contracts have to run. Again, the error of applying such a method is apparent, for it attributes to the contracts all of the earnings over and above a fair return on the tangibles, when as a matter of fact a substantial part of those earnings are attributable to good will. Granting for the sake of argument that such a method might be used, the result obtained by its application would contain three elements: (1) Value of good will, which is not exhaustible; (2) value of the contracts with an indefinite life; and (3) value of contracts with a definite life. We know of no basis upon which the three elements could be segregated.

Of the 31 contracts with respect to which the taxpayer claims an allowance for exhaustion, only 2, or possibly 3, are of such a nature that they may be made the subject of such an allowance. With respect to the latter the taxpayer has failed by any competent evidence to show their value, if they had any, at the date of acquisition.

ARUNDELL not participating.